**Clayton M. BRYANT, Petitioner, Appellant,**

v.

**George A. VOSE, Jr., Superintendent of Massachusetts Correctional Institution, Respondent, Appellee.**

No. 85–1671.

United States Court of Appeals, First Circuit.

Argued Jan. 8, 1986.

Decided March 6, 1986.

Miriam R. Goldstein, with whom Stephen A. Hopkins, and Robert V. Lizza, Sherburne, Powers & Needham, Boston, Mass., were on brief, for petitioner, appellant.

Barbara A.H. Smith, Asst. Atty. Gen., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., were on brief, for respondent, appellee.

Before COFFIN and BOWNES, Circuit Judges, and ROSENN,* Senior Circuit Judge.

COFFIN, Circuit Judge.

Appellant, Clayton M. Bryant, asks us to reverse dismissal of his writ of habeas cor-

pus. He claims two errors of constitutional dimension in his Massachusetts murder trial: admission of an involuntary oral confession made without the benefit of *Miranda* warnings, along with its "fruit", a subsequent written confession, and ineffective assistance of counsel. We reject both of these claims, and affirm dismissal of the writ.

I. *Background*

The facts of this case are set forth comprehensively in the opinion of the Massachusetts Supreme Judicial Court, 390 Mass. 729, 459 N.E.2d 792 (1984), and we therefore only summarize the facts as found by that court.[1]

On November 21, 1978, William Seduski was shot in the chest with a sixteen-gauge shotgun at his home. Appellant was known to have disliked the victim, at least in part because Seduski was involved in a steady relationship with Jane McNeal, who operated a restaurant near appellant's home. Appellant, a steady customer of the restaurant, was in love with McNeal, was fond of her children, and wanted to marry her.

Appellant was questioned on the day after the murder by the state police lieutenant in charge of the homicide investigation, and was given *Miranda* warnings at that time. The defendant voluntarily spoke with the officer but denied that he was involved in the murder. At some point during the next month, when appellant and the lieutenant met briefly on the street, the officer asked appellant if they could meet again to discuss the shooting. Appellant agreed. On February 2, 1979, the town's new police chief, who previously had been introduced to appellant, arrived at appellant's home at 5 p.m. pursuant to an appointment to speak with appellant. The chief, who had just come off duty, was in uniform and carrying a gun.

---

* Of the Third Circuit, sitting by designation.

**1.** The Supreme Judicial Court's facts were drawn from the findings of the trial judge on appellant's motion to suppress, and were amplified by facts that were undisputed at that hear-

ing. The Supreme Judicial Court bore in mind the trial judge's finding that he was "'impressed with the sincerity [and] honesty'" of the police chief, the principal witness at the suppression hearing. 390 Mass. at 731, 459 N.E.2d 792.

Appellant invited the chief into his house, offered him a cup of coffee, and the two men spoke for a few minutes. The chief then told appellant that he was investigating the shooting, and appellant agreed to discuss the crime. The chief gave appellant an incomplete version of the *Miranda* warnings, telling him that he did not have to talk, and that anything he said could be used against him in court. The chief asked appellant if he could afford an attorney, and appellant apparently suggested that he could, discussing with the chief the money he had available.

For more than two hours, the police chief and appellant discussed a number of general subjects. At 7 p.m., the chief had offered to leave, but the appellant said he had no plans for the evening and offered the chief another cup of coffee.

The conversation turned to Jane McNeal, her children, and her relationship with the victim, Seduski. At about 7:50 p.m., the chief observed that, since the homicide, McNeal had been nervous around appellant, her children were afraid of him, and he (appellant) "really made a mess of the whole situation". According to the chief's testimony, appellant responded to this information by saying that he "didn't realize that he had hurt the kids, didn't realize they were afraid of him, that he just didn't want Seduski to hurt them. And then he stated that, 'I did it, I shot him.'" After ten or fifteen seconds of silence, the chief told appellant that he (appellant) "must be glad to get that off his chest" and asked "if he want[ed] to say anything about it." Appellant then made a detailed confession.

The chief arrested appellant, brought him to the police station and gave him complete *Miranda* warnings. Appellant agreed to make a written confession, and he wrote a statement that confirmed the chief's version of the oral confession.

Both confessions were admitted at trial after a suppression hearing. After their

admission, appellant testified that he had confessed falsely to protect McNeal, whom he believed to be the police's primary suspect. He was convicted of first degree murder, and the conviction was affirmed on appeal to the Supreme Judicial Court. The Massachusetts high court noted that, without the confessions, there was insufficient evidence to convict him.

## II. *Discussion*

### A. *Admission of the Confessions*

Appellant argues that his oral confession to the police chief was inadmissible because it was both involuntary and made without the benefit of *Miranda* warnings. We shall address the *Miranda* issue first, only to the extent necessary to explain why we do not reach the merits of that claim.

Appellant would have been entitled to *Miranda* warnings only if he was subjected to "custodial interrogation", *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Both the Massachusetts Supreme Judicial Court and the federal district court concluded that appellant was not in custody during his conversation with the police chief.[2] If this conclusion is correct, the oral confession would be excludible only if appellant succeeded in proving that it was involuntary.

We decline to decide whether appellant was in custody because, under *Oregon v. Elstad,* — U.S. —, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), even if appellant was in custody during the discussion at his home, our resolution of this case depends solely upon the outcome of the voluntariness question. The Supreme Court concluded in *Elstad* that "technical" violations of the *Miranda* requirements—the failure to give the warnings before a wholly *voluntary* admission—would not preclude admission of fully warned, voluntary statements obtained at a later time.

---

**2.** The Supreme Judicial Court noted that the question of whether appellant was in custody following his initial statement of "I did it, I shot him" "is a close one", 390 Mass. at 738, 459

N.E.2d 792, and the district court agreed that "the question is a closer one" than the question of custody at the time preceding that statement.

"[A] suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings, [105 S.Ct. at 1298].... Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made", *id.* 105 S.Ct. at 1293–94.

Thus, if appellant's oral confession was voluntary, even if that confession must be suppressed because of a *Miranda* violation, his later written confession would be admissible because it was fully warned and given in circumstances devoid of compulsion.[3] If the written confession was properly admitted, the trial court's decision to admit the oral confession as well would be no more than harmless error.

■ The Supreme Judicial Court found that appellant's written statement confirmed the details of the oral confession as described by the chief; the jury therefore would have learned no more from the improperly admitted confession than it did from the properly admitted one. The written statement was the more potent confession; it was in the appellant's handwriting and not subject to the credibility questions that would surround the police chief's version recited from memory. Once the jury had before it the confession in appellant's handwriting, the impact of the oral confession would have been merely cumulative. For these reasons, we find that if the oral confession was voluntary and not obtained by "improper tactics", *Elstad*, 105 S.Ct. at 1296, there is no remediable error in the trial court's decision to admit it into evidence. This is so even assuming that appellant was subjected to custodial interrogation without the benefit of full *Miranda* warnings.

We thus turn to our consideration of the voluntariness of the oral confession. The Supreme Court recently has confirmed that a federal court must independently evaluate the admissibility of an allegedly coerced confession, *Miller v. Fenton*, —— U.S. ——, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). Although subsidiary factual questions are entitled to the presumption of correctness established by 28 U.S.C. § 2254(d) for state court findings of fact, "the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination." *Id.* 106 S.Ct. at 451.

Appellant argues that his confession was the product of psychological overbearing and a promise of leniency by the chief. He points to two statements in support of this contention. First, early in his conversation with the police chief, after appellant denied his involvement in the murder, the police chief responded, "That's not the truth, Mac, is it?" Second, the police chief told appellant that, to the best of his knowledge, the general practice for persons who are "crazy" and commit serious crimes is for them "to be sent for observation to Bridgewater for—I don't know if I said twenty or forty days—sent to Bridgewater for observation, then they're determined whether or not they're capable of standing trial."

Appellant suggests that even without an explicit reference to the Seduski murder, and even without a direct offer of leniency, this comment on Bridgewater, combined with the earlier challenge to appellant's version of the facts, in the context of the "overall behavior of the police officer", was sufficient to overbear appellant's will. We disagree.

The question as to compulsion is "whether the will of the defendant had been overborne so that the statement was not his

---

**3.** Appellant argues only that the written confession should have been suppressed as tainted fruit of the prior confession, and not that it was involuntary because of the manner in which it was elicited. Indeed, there is no evidence that any pressure was exerted in order to secure the written confession.

free and voluntary act, and that question [is] to be resolved in light of the totality of the circumstances". *Procunier v. Atchley*, 400 U.S. 446, 453, 91 S.Ct. 485, 489, 27 L.Ed.2d 524 (1971); *see also New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 2631, 81 L.Ed.2d 550 (1984); *Beckwith v. United States*, 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976); *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 1424, 22 L.Ed.2d 684 (1969). The trial judge here, in ruling on the motion to suppress, found that "there was no evidence whatsoever of any promise by the Chief; no evidence of any inducement; no evidence of any physical violence or intimidation. There were none." We agree that the facts here do not support a claim of coercion.

The conversation in the instant case took place at the appellant's home with his voluntary acquiescence. Appellant was not the chief's primary suspect, and the talk between the two men was informal and wide-ranging. Appellant had been told that he need not speak to the chief at all, and that what he said could be used against him in court. Appellant, who was college-educated, told the chief that he understood his rights. The only confrontational comment made by the police chief came near the beginning of the conversation, when the chief challenged appellant's version of his activities on the evening of the murder. The conversation then went on for more than two hours before appellant confessed. The reference to Bridgewater did not directly suggest leniency, let alone promise it. Any indirect promise to be inferred from the Bridgewater remark is so slight as to be insignificant in these circumstances.

█ It is much more likely that the police chief's observations about Jane McNeal and her children triggered feelings of sorrow and remorse in appellant, prompting his confession. But there was no suggestion by the police chief that a confession would restore appellant's prior reputation with McNeal and her children. We thus conclude that even if appellant's confession were an emotional response to the thought of alienating the family he loved, it was not, in these circumstances, the product of coercion or other improper tactics. *See Corn v. Zant*, 708 F.2d 549, 567 (11th Cir. 1983), *vacated in part on other grounds*, 772 F.2d 681 (11th Cir.1985) ("mere emotionalism and confusion do not necessarily invalidate [confessions]").[4] We therefore hold that, under *Oregon v. Elstad*, appellant's written confession was properly admitted into evidence. Accordingly, as we discussed above, admission of his oral confession was at most harmless error.

---

**4.** It is worth noting briefly the facts of several cases in which promises of leniency or other sorts of mental pressure were found to undermine the voluntariness of a confession. In *Lynumn v. Illinois*, 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922 (1963), "petitioner's oral confession was made only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate'". In *United States v. Powe*, 591 F.2d 833, 845 n. 36 (D.C.Cir. 1978), the defendant's testimony described the offers of leniency as follows: "[The detective] made propositions to me as far as turning over drug dealers up in that area over to him, to drop my case and Mr. Harris' case." *See also, e.g., United States ex rel. Lewis v. Henderson*, 421 F.Supp. 674 (S.D.N.Y.1976).

Two cases in which no coercion was found also provide helpful comparisons. In *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), the petitioner was given partial *Miranda* warnings before a three-hour interview with two Internal Revenue Service agents at a private home where the petitioner occasionally stayed. The agents described the conversation as "friendly" and "relaxed", and the petitioner acknowledged both that he understood his rights and that "the agents did not 'press' him on any question he could not or chose not to answer.'" *Id.* at 343, 96 S.Ct. at 1614. In *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), petitioner confessed following partial *Miranda* warnings and an interrogation that lasted for slightly more than an hour. He had been told falsely that his cousin, who also had been indicted for the same murder, already had confessed. He began his story, and when he hesitated and noted that he needed a lawyer to avoid getting into more trouble, the police officer interrogating him said, "'You can't be in any more trouble than you are in now'". *Id.* at 738, 89 S.Ct. at 1424. The questioning continued and a full confession was obtained. *See also, e.g., Oregon v. Elstad*, —— U.S. ——, 105 S.Ct. 1285, 1296, 84 L.Ed.2d 222 (1985).

## III. *Ineffective Assistance of Counsel*

Appellant claims that three aspects of his trial defense deprived him of effective assistance of counsel, in violation of his rights under the Sixth Amendment. We note first that appellant's conviction must be reversed only if "counsel's performance was deficient" and "the deficient performance prejudiced the defense". *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Attorney performance is sufficient for Sixth Amendment purposes so long as it is "reasonably effective". *Id.*

We thus turn to the specific allegations of deficiency. First, appellant claims that defense counsel "threw in the towel" in his closing argument by disparaging appellant's motive for confessing, and by failing to argue that appellant relied on promises and inducements by the prosecution in making his confession. We have carefully reviewed the entire closing statement, and disagree with defendant's characterization of it. We borrow the language of the Supreme Judicial Court:

> "Although counsel did state that the average person would not be impelled by an unrequited love to confess falsely to a murder, counsel's argument as a whole did not undermine the defense. Counsel's tactic was to focus the jury's attention on the defendant's subjective state of mind at the time he confessed, and to argue that, while others in similar circumstances would not have claimed responsibility for a crime they had not committed, the defendant's assertion at trial that he had done so was credible.... We will not second guess such a tactical judgment." 390 Mass. at 753–54, 459 N.E.2d 792.

In addition, although defense counsel did not emphasize the alleged promise of leniency in his closing argument, he did remind the jurors of appellant's testimony regarding it.

Appellant's second claim of inadequacy in representation was his lawyer's failure to call as a witness Stephen Smith, a neighbor of the victim's. Smith would have testified that he heard what he believed to be a snowball hit his house at about 7 p.m. on the night of the shooting, and he placed the noise at that time because he recalled that "The Odd Couple" had just come on television. Appellant apparently suggests that the sound Smith heard was the gunshot, and he points out that telephone records showed that he was at home and on the telephone with his sister from 7:03 p.m. until 7:27 p.m. Although Smith's testimony would have supported defendant's case, the statement does not by any means establish conclusively the time of the shooting. In light of appellant's confessions and the other evidence presented as to the time of death, there is not a "reasonable probability" that the jury's conclusion would have been different if it had had Smith's testimony to consider. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2069.

Finally, appellant complains that trial counsel inadequately presented the argument that his confessions were involuntary. Trial counsel did, however, bring out this argument both at the suppression hearing and at trial. Although we have concluded that the voluntariness inquiry is the pivotal one in light of *Oregon v. Elstad*, we can not say that counsel's decision to emphasize instead the issue of custodial interrogation "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result", *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2064.[5]

We thus reject appellant's Sixth Amendment claim.

*For the foregoing reasons, dismissal of the writ of habeas corpus is affirmed.*

---

5. We note that even in his briefs to us, appellant focused more on the issue of custodial interrogation than on the involuntariness of his statements.